AO 93C  (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means (USAO rev. 12/20)          ☐ Original     ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the<br>person by name and address)*<br>A white 2016 Mazda CX-5 with vehicle<br>identification number JM3KE4DY1G0724458 and<br>bearing California license plate 8ZUH986 and<br>located at the Murrieta Police Department | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 5:22-MJ-00373 |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Central District of California *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit, or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

Such affidavit or testimony are incorporated herein by reference and attached hereto.

**YOU ARE COMMANDED** to execute this warrant on or before <u>14 days from the date of its issuance</u> *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

You must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to <u>the U.S. Magistrate Judge on duty at the time of the return</u> <u>through a filing with the Clerk's Office.</u>


Date and time issued: _____          _____
                                                                                        *Judge's signature*

City and state:      <u>Riverside, CA</u>_____          <u>Honorable Shashi H. Kewalramani, U.S. Magistrate Judge</u>
                                                                                        *Printed name and title*


AUSA: Ryan Mansell (951-368-1474)

AO 93C  (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means (Page 2)
(Page 2)

| Return |
|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : |
| Inventory of the property taken and name of any person(s) seized: |

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## **AFFIDAVIT**

I, Jennifer E. Mehr, being duly sworn, declare and state as follows:

### I. **PURPOSE OF AFFIDAVIT**

1.      This affidavit is made in support of an application for a warrant to search a white 2016 Mazda CX-5 with vehicle identification number ("VIN") JM3KE4DY1G0724458 and bearing California license plate 8ZUH986 and located at the Murrieta Police Department, 2 Town Square, Murrieta, California 92562 (the "SUBJECT VEHICLE"), further described in Attachment A.

2.      The requested warrant seeks authorization to seize evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1028 (Identity Fraud), 1028A (Aggravated Identity Theft), 1029 (Access Device Fraud), and 1344 (Bank Fraud) (collectively, the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

3.      The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF DETECTIVE JENNIFER MEHR

4.    I am a Detective for the Murrieta Police Department
("MPD") and a Task Force Officer ("TFO") with the United States
Postal Inspection Service ("USPIS").  I have been employed with
the MPD since March 2008.  Since May 2022, I have been appointed
Special Deputation by the U.S. Marshal Service to seek and
execute federal search and arrest warrants under United States
Code, Title 18 Authority, as it relates to the USPIS.

5.    I am currently assigned to the Inland Empire Mail
Theft Task Force Team with the USPIS, which investigates crimes
against the United States Postal Service ("USPS") and crimes
related to the misuse and attack of the mail system, including
mail theft, fraud, and related activity in connection with
access devices (such as credit and debit cards), identity theft,
and unauthorized use of personal identifying information.  I
have experience and have investigated cases involving mail theft
and various fraudulent activity and schemes, including identity
theft, check fraud, bank fraud, and credit card fraud.

6.    Prior to working as a TFO, I was a Police Officer with
MPD.  Prior to my employment with the MPD, I was employed as a
law enforcement officer with the San Diego Police Department,
the San Diego State University Police Department, and a Deputy
Sheriff for the Arlington County Sheriff's Office (Virginia).
During my employment, I have investigated various types of
fraud, including credit card fraud, schemes to defraud, and
organized retail crime.

7.    I have also participated in the execution of numerous search warrants, many of which involved crimes relating to the Subject Offenses.

8.    I have conducted and assisted in conducting criminal investigations on subjects who used the Internet and two-way communication devices, such as cellular telephones, to commit the Subject Offenses.  I make this affidavit based upon my personal knowledge and experience, my review of pertinent documentation, and discussions with other law enforcement officers.

9.    Through both my training and my experience, I have become familiar with the methods of operation used by people who commit offenses involving identity theft and the production of fraudulent identity documents.  I have experience concerning the production, use, and implementation of persons who utilize the identity of another to commit unlawful activity.  My investigative experience has helped me understand how people commit identity theft and fraud.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

10.   During April 2022, two mail thefts occurred at the same apartment complex in Murrieta, California.  Video surveillance of the mail thefts showed they were committed utilizing the SUBJECT VEHICLE.  Further investigation showed the SUBJECT VEHICLE was fraudulently purchased in the name of "Chandler Ward," who is a real person and victim of identity theft.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

### A.   The MPD Takes Mail Theft Reports

11.   On or about April 27 and 29, 2022, the MPD took reports involving damage to mailboxes located at the Madison Reserves, 41410 Juniper Street, Murrieta, California, and obtained video surveillance from the Madison Reserves capturing the following:

a.   On April 27, 2022, two suspects arrived in the SUBJECT VEHICLE.  The driver of the SUBJECT VEHICLE was later identified as Zackary Steed Coats ("COATS").  The suspects then forced open the mailboxes and placed the mail inside the SUBJECT VEHICLE.

b.   On April 29, 2022, COATS again arrived in the SUBJECT VEHICLE.  COATS, the only occupant of the SUBJECT VEHICLE, forced open the mailboxes and placed mail inside the SUBJECT VEHICLE.

c.   On both occasions, the license plate[1] of the SUBJECT VEHICLE was visible.

12.   Records checks revealed that the SUBJECT VEHICLE was registered with an address of 4249 W. West Avenue, Fullerton, California 92833, to "Chandler Ward."  California Department of Motor Vehicle ("DMV") records showed the vehicle had recently been registered on or about March 14, 2022.

---

[1] Initially, the SUBJECT VEHICLE displayed California temporary license plate BF49X78.  A check of this license plate through California Department of Motor Vehicle records showed California license plate 8ZUH986 assigned to the SUBJECT VEHICLE.

13.   On or about June 2, 2022, U.S. Postal Inspector Derek Baker notified me that a letter carrier with the USPS had recently discovered mail in the middle of the street in the neighboring city of Wildomar, California.  The discarded mail was an orange envelope that was addressed with a sender of Russell Westbrook Used Car Superstore, Anaheim, California.  On the front of the envelope there was an address label that included a license plate number of 8ZUH986, and, on the back, a stamp of the same number.  The envelope had already been ripped open, and inside were several documents.  There was a receipt for a DMV ID renewal in the name of "Zachary Steed Coats," an ID card and a couple credit cards belonging to Corey Morris, and a visa debit card and a casino players card in the name of Joseph Lowe, who lives at the Madison Reserves.[2]

14.   I searched law enforcement databases for persons associated with the SUBJECT VEHICLE's registration address of 4249 W. West Avenue, Fullerton, California, and found an association for COATS.[3]  I was previously familiar with COATS because of a prior MPD case which had occurred during February 2021.  During that case, I had investigated a check which had been altered to COATS's name and had been deposited into COATS's

_____

[2] A motorcycle had been purchased in June of 2021 in Lowe's name and was purchased using the P.O. Box address that was on the DMV renewal in COATS's name.

[3] During a subsequent interview with COATS, he stated the address belonged to his mother.

bank account.  The check had been part of mail stolen from the Madison Reserves.[4]

15.  I obtained the prior investigation file and located several photos of COATS in the file.  I compared the photos from the file with still-images of the SUBJECT VEHICLE's driver from the Madison Reserves' video surveillance.  I recognized the driver of the SUBJECT VEHICLE as COATS.

16.  COATS's criminal history showed he had several outstanding local warrants for his arrest, including a warrant issued in relation to my previous investigation.

**B.   Identification/Statement of Chandler Ward**

17.  I learned that "Chandler Ward," identified as Chandler Vashaun Ward, currently lives in Antioch, Tennessee.  Ward's Tennessee driver's license describes him as a black male, 6'01" tall, and approximately 300 pounds.  This description did not match the still images of COATS or the suspect passenger.

18.  On or about June 2, 2022, I contacted the Russell Westbrook Used Car Superstore.  I spoke with the General Manager Chris Ramsey regarding the purchase of the SUBJECT VEHICLE. Ramsey told me the vehicle was purchased on or about March 12, 2022, by "Chandler Ward."  Ramsey provided me an email containing the identification used during the purchase of the SUBJECT VEHICLE.  The identification provided was a Tennessee driver's license and showed an image of a white male.

---

[4] I showed the Madison Reserves HOA manager a 6-pack of mugshot photos, including COATS photo, and he did not recognize anyone.

19.   Inspector Baker requested and obtained the image on
Ward's Tennessee driver's license.  The image on Ward's
Tennessee driver's license did not match the Tennessee driver's
license used to purchase the SUBJECT VEHICLE.  The
identification number, date of birth, address, first and last
name matched Ward's real license, but the eye color and driver's
photo had been modified with an alternate picture and a
different eye color.  The alternate picture was of a white male
that appeared to be the second unknown suspect from the Madison
Reserves video surveillance captured on or about April 27, 2022.

20.   On or about June 2, 2022, I asked Metro Nashville
Police Department to attempt to contact Ward at his residence.

**C.   The MPD Locates the SUBJECT VEHICLE and COATS**

21.   On or about June 4, 2022, MPD Police Officer
Christopher Nelson located the SUBJECT VEHICLE at 36164 Hidden
Springs Road, Wildomar, California.  COATS was asleep inside the
vehicle wearing a bright orange road-guard vest and the front
passenger seat contained mail.  COATS was arrested on
outstanding warrants and transported to the Murrieta Police
Department.  The SUBJECT VEHICLE and its contents were towed to
the MPD.

22.   In the front seat of the SUBJECT VEHICLE, in plain
view and visible from outside the vehicle through the window,
were several pieces of mail.  The addresses appeared clearly
visible and purported to show the mail came from The Camden
Vineyards Apartments, 24323 Jackson Avenue, Murrieta,
California.  On the dashboard of the SUBJECT VEHICLE, in plain

view and visible from outside the vehicle through the window,
appeared to be a check made out to "Chandler Ward."

23.   The SUBJECT VEHICLE was not searched and was locked
and sealed in a secure lot at the MPD.  A search of COATS's
person incident to his arrest yielded keys for the SUBJECT
VEHICLE, a fraudulent "Chandler Ward" Tennessee ID, a roadside
assistance card for "Chandler Ward" from Russell Westbrook
Hyundai of Anaheim, a debit card from ANDO, an online bank, for
"Chandler Ward," and a debit card in the name of "Edith Camiro
Santiago."

       **D.   Interview with COATS**

24.   On or about June 4, 2022, Inspector Baker and I
interviewed COATS at the MPD.  COATS was read his <u>Miranda</u> rights
from a form which he waived by signing.  The interview with
COATS was recorded.  The below is not all inclusive of the
interview with COATS, but merely a summary cited for purposes of
establishing probable cause in application of this warrant.
COATS stated the following:

       a.   He and the second suspect had used the SUBJECT
VEHICLE to commit the Subject Offenses.  Furthermore, COATS
stated that he was involved in the purchase of Ward's
information over the internet and paid for Ward's information
using cryptocurrency.  COATS stated he lives in the SUBJECT
VEHICLE, which houses his digital devices, including a computer
and cellular phone, both used to facilitate and aid in the
commission of purchasing the fraudulent Tennessee driver's
license.  COATS also stated he had purchased check printing

software for his computer and uses a printer also inside the
SUBJECT VEHICLE to print checks.

       b.   COATS stated the second suspect had purchased the
SUBJECT VEHICLE, then sold it to him for $1,500. with monies
owed.

### E.   Interview with Chandler Ward

25.  On or about the same date, Inspector Baker and I spoke
with Chandler Ward, who told me he had recently been the victim
of identity theft.  Ward told me someone had used his name,
identification, social security number, and other identifying
information to purchase a 2016 Mazda vehicle, and that he had
received mail from Capital One bank indicating as such.  He also
told me he had been receiving multiple pieces of mail for
denials of credit card applications and vehicle loans that he
had not applied for.

26.  Additionally, Ward stated a person had accessed his
Navy Federal Credit Union account and had successfully withdrawn
approximately $1,300 from a branch located in Southern
California.  Ward said he has not been to California and had not
purchased any vehicles or attempted to purchase any vehicles.
Ward stated he did not purchase the SUBJECT VEHICLE or authorize
the purchase of the SUBJECT VEHICLE.

### F.   Information Regarding Ward's Navy Federal Credit Union
###      Account

27.  On or about June 7, 2022, Inspector Baker received
video surveillance from Navy Federal Credit Union Senior
Investigator Edgar Barnard.  The video surveillance appeared to

show a withdrawal, on or about April 4, 2022, in Brea,
California, and an attempted withdrawal, on or about May 16,
2022, in Murrieta, California, from Navy Federal Credit Union
locations in those cities.  The videos clearly show COATS
conducting the withdrawal and attempted withdrawal.

28.  Based on the aforementioned facts, I believe
additional evidence of the Subject Offenses is located inside
the SUBJECT VEHICLE.

### V.   TRAINING & EXPERIENCE ON DIGITAL DEVICES[5]

29.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.   A person who connects to the Internet must use a
computer or mobile device, such as a tablet or wireless/cellular
telephone, to facilitate that access.  Furthermore, in my
training and experience, these devices typically travel with a
subject or remain in the SUBJECT VEHICLE.  It is therefore
reasonable to believe that computers, tablets, wireless
telephones, and other electronic storage media may be present in
SUBJECT VEHICLE.  Further, because it is possible to store

---

[5] As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
paging devices, mobile telephones, and smart phones; digital
cameras; gaming consoles; peripheral input/output devices, such
as keyboards, printers, scanners, monitors, and drives; related
communications devices, such as modems, routers, cables, and
connections; storage media; and security devices.

certain mobile devices, such as removable storage media and
wireless telephones, in a pocket, it is reasonable to believe
that mobile devices may be found on the persons.

      b.   Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

      c.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat

programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

d.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

e.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

f.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

g.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult

to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

      h.   Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

## VI. TRAINING AND EXPERIENCE REGARDING MAIL AND IDENTITY THEFT

    30.  Based on my training and experience and information
obtained from other law enforcement officers who investigate
mail and identity theft, I know the following:

      a.   People who steal mail are often involved in fraud
and identity theft crimes.  These individuals usually steal mail
looking for checks, access devices, other personal identifying
information (such as names, social security numbers, and dates
of birth), and identification documents that they can use to
fraudulently obtain money and items of value.  Mail thieves
often retain these items of value from stolen mail to make
fraudulent purchases or sell the items to others in exchange for
cash or drugs.

      b.   It is a common practice for those involved in
access device fraud to use either false identification or stolen
real identification to make purchases with stolen access devices
at retail stores to avoid detection and to complete the
transaction.  Those who engage in such fraud keep evidence of
such retail transactions in their homes and cars.

c.   It is common for identity thieves, and
individuals engaged in bank fraud, access device fraud, and
identification document fraud to use equipment and software to
print credit and identification cards, to create magnetic strips
for credit cards, to use embossing machines to create credit
cards, to use laser printers to create checks, and to use
magnetic card readers to read and re-encode credit cards.
Software relevant to such schemes can often be found on digital
devices, such as computers.  Such equipment and software are
often found in thieves' and fraudsters' residences and vehicles.

d.   It is common practice for individuals involved in
mail theft, identity theft, bank fraud, and access device fraud
crimes to possess and use multiple digital devices at once.
Such digital devices are often used to facilitate, conduct, and
track fraudulent transactions and identity theft.  Suspects
often use digital devices to perpetrate their crimes due to the
relative anonymity gained by conducting financial transactions
electronically or over the internet.  They often employ digital
devices for the purposes, among others, of: (1) applying online
for fraudulent credit cards; (2) obtaining or storing personal
identification information for the purpose of establishing or
modifying fraudulent bank accounts and/or credit card accounts;
(3) using fraudulently obtained bank accounts and/or credit card
accounts to make purchases, sometimes of further personal
information; (4) keeping records of their crimes; (5)
researching personal information, such as social security

numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

e.   Oftentimes mail and identity thieves take pictures of items retrieved from stolen mail or mail matter with their cellphones.

f.   It is also common for mail and identity thieves to keep "profiles" of victims on digital devices.  Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.

g.   Based on my training and experience, I know that individuals who participate in mail theft, identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business.  Oftentimes, they do so on their digital devices. Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.

h.   In my training and experience, mail theft is a means to commit identity theft and is often accomplished using one of the following methods: (a) a credit card fraudulent application scheme, or (b) an account takeover ("ATO") scheme,

which frequently operates as follows and has the following characteristics:

i.   In a credit card fraudulent application scheme, fraudulent credit card accounts are applied for and opened by an individual using the identifying information of another individual without their knowledge or consent.  While posing as the individual whose identifying information is being used, the perpetrator of the fraudulent application scheme will instruct the issuing bank to forward the requested credit card and personal identification number ("PIN") to an address controlled by the perpetrator rather than the address of the individual whose identifying information was misappropriated.

j.   An ATO scheme involves the perpetrator fraudulently taking-over a pre-existing account of a legitimate customer of a credit card company.  Frequently, individuals involved in an ATO scheme will, while posing as the true account holder, instruct the issuing bank to issue a replacement credit card and PIN, and to mail that card and PIN to an address controlled by the perpetrator, rather than the true card holder's address.  The perpetrator may also attempt to have the issuing bank change the address or telephone number that it associates with the taken-over account and may also attempt to add other co-conspirators as authorized users of the taken-over account.

k.   In both types of credit card schemes described above, after fraudulently obtaining credit cards in the manners described above, those credit cards thereafter will be used to

make purchases for the benefit of the perpetrators of the scheme
or others.

l.    Individuals involved in ATO schemes or fraudulent
credit card application schemes keep evidence of their schemes
at their residences, automobiles, garages, and storage
structures, such as account statements, applications, receipts,
identity documents and convenience checks, credit cards and
driver's licenses, related to those schemes.  Individuals in
such schemes also frequently keep or maintain lists containing
victim information, such as names, dates of birth, social
security numbers, addresses, and so forth.

m.    Individuals involved in ATO schemes or fraudulent
credit card application schemes often keep information on
computers or computer storage devices, including lists of PII.
Based upon my training, experience, and information related to
me by other law enforcement personnel who specialize in the
investigation of identity theft crimes, I have learned that it
is common practice for individuals involved in access device
fraud, bank fraud, and identity theft to use and maintain
computers at their residence and business.  Such computers are
used to track their fraudulent transactions.  Suspects often use
computers to perpetrate their crimes due to the relative
anonymity gained by conducting financial transactions
electronically or over the internet.  They often employ
computers for the purposes, among others, of 1) applying on-line
for fraudulent credit cards, 2) obtaining personal
identification information for the purpose of establishing or

modifying fraudulent credit card accounts, 3) using fraudulently
obtained credit cards to make purchases, sometimes of further
personal information, and 4) keeping records of their crimes.

n.   Based on my training and experience, I know the
following: Individuals involved in identity theft/fraud schemes
like this one must keep evidence of their schemes, such as pay-
owe sheets for dividing the proceeds, contact information for
their co-conspirators, lists of stolen identities and accounts
used in the scheme, simply to keep the scheme going.  These
individuals often use the proceeds of their fraud to purchase
expensive items or keep the proceeds in the form of cash to make
their crime harder to detect.  Individuals involved in fraud
schemes often are invited to join the scheme by their friends
and relatives, who trust them.  Commonly they take photographs
of some of their co-conspirators -- that is, the ones with whom
they have a personal relationship -- or of themselves with the
co-conspirators to commensurate the success of their fraud.
Typically, they maintain all this evidence where is close at
hand and safe, such as in their residences, vehicles, and
digital devices, which are also commonly stored in their
residences and vehicles.  Such individuals commonly maintain
multiple cellular telephones to compartmentalize their contacts,
and communicate with their fellow participants by phone, email,
and text messages.  Often, they employ a code to disguise the
criminal nature of their communications, the simplest of which
is omitting the units they are discussing.  For example, instead
of emailing, "send me 3 credit cards," they may email "send me

3." I know that individuals who commit crimes with the aid of electronic devices do not readily discard them, as computers, tablets and cell phones are expensive items that are typically used for years before being upgraded or discarded.  Computers, tablets, and cell phones can be used to communicate between co-conspirators and may contain information relating to the crimes under investigation.

31.  I know from training and experience that those individuals involved in identity theft, credit card and/or gift card fraud keep evidence of their schemes at their residences, vehicles, garages, and storage structures, such as account statements, applications, receipts, identity documents and convenience checks, credit cards and driver's licenses, related to those schemes.  Individuals in such schemes also frequently keep or maintain lists containing victim information, such as names, dates of birth, social security numbers, addresses, and so forth.

## VII. CONCLUSION

32.  For all the reasons described above, there is probable cause to believe to believe that evidence, fruits, and instrumentalities of violations of the Subject Offenses, as described more fully in Attachment B, will be found in a search of the SUBJECT VEHICLE.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
June, 2022.


_____

## **ATTACHMENT A**

**PREMISES TO BE SEARCHED**

A white 2016 Mazda CX-5 with Vehicle Identification Number ("VIN") JM3KE4DY1G0724458 and bearing California license plate 8ZUH986 and located at The Murrieta Police Department, 2 Town Square Murrieta, California 92562 (the "SUBJECT VEHICLE").  The SUBJECT VEHICLE includes all storage areas, boxes, bags, safes, lockers, and any containers found in the aforementioned areas. The SUBJECT VEHICLE is pictured below.



**ATTACHMENT B**

## I.  **ITEMS TO BE SEIZED**

1.  The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 1028 (Identity Fraud), 1028A (Aggravated Identity Theft), 1029 (Access Device Fraud), and 1344 (Bank Fraud), (collectively, the "Subject Offenses"), namely:

a.  Data, records, documents, or information pertaining to obtaining, possessing, using, or transferring any of the following:

i.  personal identification information;

ii.  financial transaction information;

iii. addresses, phone numbers, credit and debit card numbers, security codes (e.g., PIN numbers), bank account numbers, other financial institution account numbers; and

iv.  social security numbers, email addresses;

b.  Records, documents, programs, applications, or materials pertaining to applications for, or use of, credit or debit cards, bank accounts, or merchant processor accounts;

c.  Data, records, documents (including e-mails), or information reflecting or referencing purchases of merchandise, securities, electronic currency, and other valuable things;

d.  Data, records, documents (including e-mails), or information reflecting or referencing fraudulent purchases;

e.  Software, devices, or tools used to obtain, create, or use counterfeit or unauthorized checks, coupons, or access devices such as credit, debit, bank, and gift cards;

f.    Records, documents, programs, applications, or
materials relating to United States mail or mail matter;

g.    Contents of any calendar or date book stored on
any of the digital devices for the time period January 1, 2021,
though the date the search warrant is executed;

h.    Global Positioning System ("GPS") coordinates and
other information or records identifying travel routes,
destinations, origination points, and other locations for the
time period January 1, 2021, through the date the search warrant
is executed;

i.    Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show address book information, including all stored or saved
telephone numbers;

j.    Records, documents, programs, applications and
materials, or evidence of the absence of same, sufficient to
show call log information, including all telephone numbers
dialed from any of the digital devices and all telephone numbers
accessed through any push-to-talk functions, as well as all
received or missed incoming calls;

k.    Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show SMS text, email communications or other text or written
communications sent to or received from any of the digital
devices and which relate to the Subject Offenses;

l.    Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to

show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the Subject Offenses;

m.   Audio recordings, pictures, video recordings, or still captured images of United States mail or mail matter, whether opened or unopened, or relating to the possession or distribution of drugs or the collection or transfer of the proceeds of the Subject Offenses; and

n.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

o.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, which pertain to accounts with any Internet Service Provider.

p.   Records, documents, programs, applications, materials, and files relating to the deletion, uploading, and/or acquisition of access devices to include photographs, videos, e-mails, chat logs, or other files.

r.   With respect to any digital devices containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   Evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents,

browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   Evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. Evidence of the attachment of other devices;

iv.  Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   Evidence of the times the device was used;

vi.  Passwords, encryption keys, and other access devices that may be necessary to access the device;

vii. Applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.    Records of or information about Internet Protocol addresses used by the device;

ix.  Records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

33. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records,

documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

       a.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, which pertain to accounts with any Internet Service Provider.

       b.   Records, documents, programs, applications, materials, and files relating to the deletion, uploading, and/or acquisition of access devices to include photographs, videos, e-mails, chat logs, or other files.

      4.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II. <u>SEARCH PROCEDURE FOR DIGITAL DEVICES</u>

2.    In searching digital devices or forensic copies
thereof, law enforcement personnel executing this search warrant
will employ the following procedure:

a.    Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") will, in
their discretion, either search the digital device(s) on-site or
seize and transport the device(s) and/or forensic image(s)
thereof to an appropriate law enforcement laboratory or similar
facility to be searched at that location.  The search team shall
complete the search as soon as is practicable but not to exceed
120 days from the date of execution of the warrant.  The
government will not search the digital device(s) and/or forensic
image(s) thereof beyond this 120-day period without obtaining an
extension of time order from the Court.

b.    The search team will conduct the search only by
using search protocols specifically chosen to identify only the
specific items to be seized under this warrant.

i.    The search team may subject all of the data
contained in each digital device capable of containing any of
the items to be seized to the search protocols to determine
whether the device and any data thereon falls within the list of
items to be seized.  The search team may also search for and
attempt to recover deleted, "hidden," or encrypted data to
determine, pursuant to the search protocols, whether the data
falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques, including to search for known images of child pornography.

c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may

retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

3.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offenses listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

4.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.